George F. HUBER, Jr., Plaintiff,

v.

Charles A. MULLAN, Thomas Mullan, Jr., Thirty-Nine Hundred North Charles Street, Inc., George E. Banks, III, and Barbara A. Banks, his wife,

and

Chesapeake & Dallas Co., Inc., a Maryland corporation, Defendants.

Civ. A. No. 15511.

United States District Court
D. Maryland.

Dec. 4, 1964.

R. Taylor McLean, Towson, Md., and William F. Lynch, II, Wilmington, Del., for plaintiff.

Francis B. Burch, Baltimore, Md., for defendants Charles A. Mullan, Thomas Mullan, Jr. and Thirty-nine Hundred North Charles Street, Inc.

Peter Parker, Baltimore, Md., for defendant George E. Banks, III.

Arthur W. Machen, Jr., and Robert R. Bair, Baltimore, Md., for defendant Barbara A. Banks.

M. Peter Moser, Baltimore, Md., for Chesapeake & Dallas Co., Inc.

WINTER, District Judge:

After plaintiff (hereafter called "Huber") entered into a contract to sell to Harry Weinberg, agent for defendant Chesapeake & Dallas Co., Inc. (hereafter called "Chesapeake & Dallas"), for cash and notes, (a) 620 shares of the common stock of defendant Thirty-nine Hundred North Charles Street, Inc. (hereafter called "Thirty-nine Hundred"), and (b) all of the indebtedness of Thirty-nine Hundred to Huber, consisting of not less than $1,150,000.00. Huber was met by the purported exercise of a right of first refusal by defendants George E. Banks, III and Barbara A. Banks, his wife (hereafter called "Banks"), who subsequently assigned their interest in the stock and notes to defendants Charles A. Mullan and Thomas Mullan, Jr. (hereafter collectively referred to as "Mullan"). Plaintiff thereupon invoked the diversity jurisdiction of this Court to obtain a declaration of the rights of the parties. Plaintiff also prayed as supplemental relief an order permitting him to inspect the books and records of Thirty-nine Hundred, and directing Thirty-nine Hundred to reissue notes evidencing its indebtedness, without restrictions therein, so as to facilitate his making settlement to Chesapeake & Dallas.

By pretrial order, questions of liability and damages raised by the pleadings, including counterclaims, were severed, so that the Court has presented for decision the question of the rights of the parties, but not presently any question of damages. At the trial a further severance was agreed upon as to whether Banks defaulted under a contract dated December 21, 1962, should it be found that any of the present rights of the parties stemmed from that document.

Huber and George E. Banks, III are cousins. Since 1954 they and their respective families have made joint investments in numerous business enterprises, as a result of which they acted as endorsers, guarantors and comakers of various mortgages and other credit instruments. For reasons not pertinent here, there came a time when they concluded to separate their business affairs. To accomplish this, they entered into an agreement, dated December 21, 1962, by the terms and provisions of which Banks became sole owner of certain ventures, including Colt Realty, Inc., and Huber became sole owner of certain ventures, in-

cluding Thirty-nine Hundred. Since equal division could not be made in kind, Banks agreed to pay Huber $727,826.22, evidenced by a confessed judgment promissory note providing for installment payments of principal and interest. By the terms of the agreement, Banks gave Huber the option to purchase one-half of Banks' interest in Colt Realty, Inc. at one-half of Banks' cost therefor, and Huber gave Banks an option to purchase one-half or all of Huber's interest in Thirty-nine Hundred under the terms and conditions set forth in the margin.[1] By its terms, and by separate oral agreement, the agreement was not final, because it provided that the value assigned to various assets being transferred and pledged between the parties was subject to an audit and, hence, various recitals made in the agreement as to various amounts to be paid were subject to further determination.

Various efforts to refine the December 21, 1962 agreement were, for one reason or another, abortive. After the agreement was entered into, Banks pledged stock which they owned in a corporation known as Supermarkets Operating Co. to secure a bank loan from the First National Bank of Maryland, and then made a secondary pledge of that stock to Huber. At the time Banks pledged this stock to the bank it was understood that it would ultimately be sold and the proceeds applied in reduction of the bank loan. Toward the end of 1963 the bank was desirous of including the stock which it held as collateral as part of a public offering of a larger number of shares of the company. Since the underwriters of the public offering wished to make the representation that the stock to be sold to the public was "free of all liens and encumbrances" other than a bank loan, the underwriters, through their counsel, pressed Huber to release his interest in

the stock, as well as a claimed lien on all assets of the Banks family. Huber, in turn, pressed Banks to waive their option to repurchase shares of Thirty-nine Hundred. Under circumstances more fully stated infra, Banks and Huber entered into a Memorandum of Agreement, dated December 30, 1963, which is the keystone to the resolution of the issues presented by this case.

This Memorandum of Agreement recited the fact that the parties had entered into the December 21, 1962 contract giving Banks certain repurchase rights in and to the stock of Thirty-nine Hundred, and that Banks " * * * are now agreeable to waiving their rights to repurchase the aforesaid interest * * * subject to the hereinafter stated limitations." The body of the agreement then provided:

"1. That Banks do hereby waive and release any and all rights to repurchase Huber's interest in Thirty-nine Hundred North Charles Street, Inc., pursuant to the provisions of paragraph 12 of their said Agreement of December 21, 1962, subject only to the understanding that Banks shall have the right of first refusal of any prospective bona fide sale of Huber's interest in said Thirty-nine Hundred North Charles Street, Inc., providing such offer to purchase is for cash only. Said option of first refusal shall be exercised as follows:

"(a) Huber shall immediately notify Banks in writing by certified or registered U. S. Mail of all of the terms of any bona fide offer to purchase his interest in the aforesaid Corporation for cash.

"(b) Banks shall have no more than thirty (30) days within which to notify Huber of their intention to exercise or refuse to exercise their

---

1. Agreement of December 21, 1962, ¶ 12:
 "Huber agrees to give Banks' the right to purchase either one-half or all of his interest in Thirty-nine Hundred North Charles Street, Inc. at any time within five (5) years from the date of this Agreement at and for Huber's

then cost for such interest in said Corporation, plus an additional sum which shall equal interest at the rate of 6% per annum on any monies Huber has invested in said Corporation and upon which he has not received interest from said Corporation."

right to purchase for no less than the same terms and conditions as outlined in the aforesaid notice as set out in (a) above, which said notice shall also be by certified or registered U. S. Mail dated no less than thirty (30) days, as aforesaid, from the date of the notice set forth in (a) above."

The various parties suggest four possible interpretations of the Memorandum of Agreement, viz.,

1. Giving effect to the punctuation, with particular reference to the comma preceding the phrase "providing such offer to purchase is for cash only * * *," defendants (except Chesapeake & Dallas) argue that Banks waived and released their original rights to repurchase any interest in Thirty-nine Hundred *only where Huber obtained an offer to purchase his stock in Thirty-nine Hundred for cash only.* Since Huber agreed to sell to Weinberg, as agent for Chesapeake & Dallas, for cash and notes, it is contended that the rights of the parties are governed by Paragraph 12 of the agreement of December 21, 1962, and there was no effective waiver and release of this option on the part of Banks.

2. The phrase "providing such offer to purchase is for cash only" refers not to "any prospective bona fide sale of Huber's interest in Thirty-nine Hundred," but refers only to the method of payment by Banks. Under this construction, it is argued that Banks had an option of first refusal with regard to *any* sale by Huber of his interest in Thirty-nine Hundred, provided that Banks exercised their option and made payment in cash.

3. Banks' thirty day first refusal is conditioned upon Huber's receiving an offer to purchase his stock in Thirty-nine Hundred for cash only. Thus, plaintiff and Chesapeake & Dallas argue that, since Weinberg's offer was for cash and notes, Banks have no right to a thirty day refusal.

4. If the third construction urged is adopted, the phrase "for cash only" means for money value, as distinguished from an exchange of stock or an exchange of stock for assets other than money or notes. Thus, it is contended that Banks had a thirty day refusal when Huber contracted to sell his stock to Weinberg, as agent, for cash and notes, an aggregate of a certain sum, and that the thirty day refusal was properly exercised.

These various asserted constructions will be separately considered, in the light of the pertinent evidence.

The first and second possible interpretations may be disposed of summarily. The first interpretation was one urged in opening statement by defendant Barbara Banks, but substantially abandoned after testimony had been received. As to it, it suffices to say that from all of the interpretive evidence admitted at the hearing (McCormick, Evidence, 1954 Ed. pp. 442, et seq.), each of the parties to the December 30, 1963 Memorandum of Agreement understood that it supplanted in its entirety their rights under the December 21, 1962 agreement. Stated otherwise, all parties agreed that whatever interpretation they placed upon the December 30, 1963 agreement, it, and it alone, is the document from which their rights stem. Under these circumstances, punctuation alone cannot require a different meaning. See Illian v. Northwestern National Ins. Co., 215 Md. 507, 138 A.2d 884 (1958.).

The second suggested interpretation is not supported by any credible interpretive evidence and it runs counter to the cardinal rule of interpretation that all portions of a document are to be considered together and each is to be given

effect if this process yields a reasonable whole.[2] The suggested construction would render meaningless the phrase "for cash" in subparagraph (a) of the first paragraph of the December 30, 1963 Memorandum of Agreement. Manifestly, if "for cash only" in the main body of paragraph 1 referred only to the method of payment by Banks in the event they exercised their right of refusal, it would be totally unnecessary for Huber, as required by subparagraph (a) of paragraph 1, to notify Banks of all of the terms of any bona fide offer to purchase Huber's interest "for cash." There is no legally sufficient evidence showing mutual mistake to support the second possible interpretation; hence, the Court concludes that it must be rejected.

█ The third and fourth suggested interpretations may be considered together. To explore them fully it is necessary to state and find additional facts as disclosed by the evidence adduced at the hearing.

The parties contemplated that the December 21, 1962 agreement would require the execution of a new document to spell out with certainty the values of the transactions between the parties covered by the instrument, and to identify with certainty the quantity of some of the assets pledged thereunder. Subsequent to its execution, accountants were employed and various desultory negotiations between the parties ensued. At some time prior to December 21, 1962, Huber was represented by William F. Lynch, II, Esq., of Wilmington, Delaware, and plaintiff was also represented by James H. Ridgely, Esq., a partner in a Balti-

more law firm specializing in tax matters. Banks were sometimes represented by Peter Parker, Esq., an associate of a law firm in Baltimore engaged in the general practice of law.[3]

On November 11, 1963, Huber telephoned Mr. Lynch and gave him a series of instructions as to the revisions to be made to the December 21, 1962 agreement. Included in the instructions was treatment of the option to purchase plaintiff's interest in Thirty-nine Hundred.[4] Mr. Lynch, that same day, dictated a memorandum which served the dual purpose of recording Huber's instructions and constituting a set of instructions to Mr. Ridgely to prepare the new definitive agreement. With regard to the option, the memorandum stated " * * * the parties are in agreement that in the event that Huber desires to sell his interest in Thirty-nine Hundred North Charles Street, Inc., he will give Banks a first right of refusal, operative for thirty days to buy said interest for the price of which Huber proposes to sell to a bona fide purchaser. However, said first right of refusal shall be limited to cash transactions, only, and if Huber enters into a deferred payment type of sale, then Banks have no right to a first right of refusal." Mr. Lynch's testimony was that this portion of his combined memorandum and instruction sheet reflected accurately the information obtained from his client, except that the phrase "deferred payment type of sale" was the language of Lynch, while the language of Huber was "not cash sale—no option."

Mr. Ridgely proceeded with the preparation of a new definitive agreement.

2. Schapiro v. Jefferson, 203 Md. 372, 100 A.2d 794 (1953); Walton v. Washington County Hospital Association, 178 Md. 446, 13 A.2d 627, 128 A.L.R. 970 (1940); Hart v. Hart, 165 Md. 77, 166 A. 414 (1933); Hartford Accident & Indemnity Co. v. W. & J. Knox Net & Twine Co., 150 Md. 40, 132 A. 261 (1926).

3. While Mr. Parker was counsel for Banks, the Court infers from the testimony that defendant George E. Banks, III only consulted Mr. Parker as the former elected to do, and that Banks did

not consult Mr. Parker on all matters; rather, they elected in many instances to act as their own attorney.

4. Prior to this time, Banks had been requested to waive and release their option to repurchase Huber's interest in Thirty-nine Hundred, without any provision for a thirty-day refusal. They had declined to execute a memorandum of agreement bearing the putative date " * * * made this _____ day of November, A. D. 1963" to accomplish this purpose.

On December 11, 1963 he forwarded the new agreement to Mr. Lynch and also sent a copy to Mr. Parker. Paragraph 3 of the new agreement related to the Thirty-nine Hundred option. Its text is set forth in the margin,[5] and its language is substantially the same as that ultimately used in the December 30, 1963 Memorandum of Agreement.

No reply was ever received from Mr. Parker. Mr. George F. Huber, Sr.—who was not a party to the transaction or a party in this law suit, but who was a close collaborator and business advisor to his son—insisted that the matter of the option to Thirty-nine Hundred be treated in a separate document and not as part of the overall revised agreement between plaintiff and defendant Banks. Accordingly, Mr. Lynch, on or about December 16, 1963, prepared the December 30, 1963 Memorandum of Agreement which was ultimately signed, using the proposed revised agreement prepared by Mr. Ridgely as a form. Prior to the preparation of this document, defendant George E. Banks, III went to the office of Mr. Lynch and read the proposed revised agreement prepared by Mr. Ridgely.

On December 16, 1963 Mr. Lynch mailed a copy of the proposed revised agreement, as well as the December 30, 1963 Memorandum of Agreement, to defendant George E. Banks, III at his home. Mr. Lynch's letter requested both Mr. and Mrs. Banks to come to his office on December 19 for the purpose of executing these papers, at which time Mr. Lynch stated that he would be in a posi-

tion to deliver a document releasing the interest of Huber in the Supermarkets Operating Co. stock. Mr. Lynch also stated in the letter that Mr. Parker should communicate with him if he had any questions about the legal form or substance of the documents enclosed, and also that if Banks had engaged a Delaware attorney, then that attorney should communicate with Mr. Lynch also if he had any questions about the papers. Prior to December 19, 1963, defendant George E. Banks, III telephoned Mr. Lynch to state that he and Mrs. Banks would not come to Mr. Lynch's office on December 19, and also that Mr. Lynch had inadvertently failed to include the copy of the revised overall agreement prepared by Mr. Ridgely in the letter of December 16. Mr. Lynch immediately sent another copy of that agreement to Mr. Banks.

On December 30, 1963 an all day meeting occurred in the offices of First National Bank of Maryland, principally in regard to the sale of the stock of Supermarkets Operating Co. Mrs. Banks did not attend the meeting; Mr. Banks was there for the first part of the meeting and remained until lunchtime. During the course of the meeting, Huber signed the December 30, 1963 Memorandum of Agreement. The signed copy was taken by a senior vice president of the bank, who lived near Mr. and Mrs. Banks, to their home for execution. When he arrived Mrs. Banks was home alone; Mr. Banks arrived home a few minutes later. The bank official did not discuss the agreement with Mrs. Banks, or attempt

5. "3. Banks have sold their entire interest in Thirty-Nine Hundred North Charles Street, Inc. to Huber and Huber hereby releases Banks from any claim, demand or liability thereunder. Banks shall have the right of first refusal of any prospective bona fide sale of Huber's interest in said Thirty-Nine Hundred North Charles Street, Inc., providing such offer to purchase is for cash only. Said option of first refusal shall be exercised as follows:

(a) Huber shall immediately notify Banks in writing by certified or registered U. S. Mail of all of the terms of any bona fide offer to purchase his interest in the aforesaid Corporation for cash.

(b) Banks shall have no more than thirty (30) days within which to notify Huber of their intention to exercise or refuse to exercise their rights to purchase for no less than the same terms and conditions as outlined in the aforesaid notice as set out in (a) above, which said notice shall also be by certified or registered U. S. Mail dated no less than thirty (30) days, as aforesaid, from the date of the notice set forth in (a) above."

to explain it to her, other than to characterize its overall purpose. After his arrival, Mr. Banks discussed the agreement with Mrs. Banks briefly, she read it, and they both signed it.

The testimony of the parties to the December 30, 1963 Memorandum of Agreement as to what they understood it to provide and what they intended it to provide is in conflict.

Mrs. Banks testified that she had no recollection of discussing Paragraph 12 of the December 21, 1962 agreement with anyone, or any recollection of discussing the subject of any first refusal with any specific person. She admitted that the officer of the bank brought the December 30, 1963 Memorandum of Agreement to her home on that date, and characterized it as an agreement worked out that day for the trade of the option for a right of first refusal in order to facilitate the sale of Supermarkets Operating Co. stock. Mrs. Banks said that she had never discussed with the plaintiff, or any of the plaintiff's attorneys, or her own attorney, the December 30, 1963 Memorandum of Agreement. At the time that she signed it she thought that she and her husband would have the right to match *any* offer made to Mr. Huber on identical terms, and she did not notice the "poor choice of words" to accomplish that objective at that time. In direct conflict with the testimony of the bank officer, she says that Mr. Banks did not explain the agreement to her.[6] Significantly, on cross examination, she admitted that her present understanding of the document that she signed was that she and Mr. Banks would have a right of first refusal *only* if plaintiff received an offer *only* for cash, but she qualified this statement by the remark that opinions as to the meaning of the language can differ.

Mr. Banks' testimony was that the principal objection to the option set forth in Paragraph 12 of the December 21, 1962 contract originated from Mr. Huber, Sr., and that the latter's feelings precipitated a family fight. Mr. Banks admitted that he had indicated his willingness to a modification of the option if he got a right to match any deal that Huber might make with a third person. He claimed that Huber had always indicated his willingness to take notes of Mr. Banks in connection with any transaction concerning Thirty-nine Hundred if the notes were approved as to credit risk by the Wilmington Trust Company. In regard to the crucial phrases of the December 30, 1963 Memorandum of Agreement, Mr. Banks testified that he thought "for cash" meant only an offer to purchase made to Mr. Huber for money, irrespective of how payable, rather than an exchange of real estate or other assets and, hence, that he and Mrs. Banks had the right to match any offer for a transaction expressed in terms of dollars as distinguished from consideration not having a fixed monetary value. Mr. Banks admitted that Huber had talked with him prior to the time Huber contracted to sell his interest in Thirty-nine Hundred to Weinberg, as agent for Chesapeake & Dallas; he denied, however, saying that he would waive his right of first refusal, and said that Huber told him only that some papers would be sent to him to facilitate Huber's concluding his proposed arrangement with Mr. Weinberg. In regard to the sale of Supermarkets Operating Co. stock, Mr. Banks denied that any such stock was pledged with First National Bank of Maryland, or that the papers signed by Huber were necessary to the sale of such stock.[7]

Huber gives quite a different version of what was intended between the parties. His testimony was that when the

6. Although, on a point not determinative of any of the issues in the case, the Court finds, as a matter of credibility, that Mr. Banks did explain the agreement to his wife.

7. The latter statement was based on the belief that the bank could have sold the stock without obtaining a release of the pledge to Huber and of Huber's lien, and could have placed the proceeds in escrow, presumably to await further negotiation or litigation.

December 30, 1963 Memorandum of Agreement was signed it was his intent that Banks would have only a limited right of refusal, namely, a right of refusal only if Huber receiver a cash offer. If Huber received an offer to purchase his interest for cash and notes, then Banks had no right of first refusal. Notwithstanding this straightforward explanation of intent, Huber admitted that when his deposition was taken prior to trial he had testified that under a proper construction of the document Banks would have a right to meet any offer which Huber obtained, provided they met it with cash and notes, other than their own notes. He also admitted that, subsequent to the taking of his deposition, he had discussed his testimony on deposition with his counsel. Huber further testified that while he was negotiating with Mr. Weinberg, and before he signed any documents agreeing to sell his interest to Mr. Weinberg, as agent, he had at least one conversation (and his recollection was two) with Mr. Banks via long distance telephone (Mr. Banks being in Florida at the time) to tell Mr. Banks about the possibility of the sale to Mr. Weinberg and to ask Mr. Banks' opinion concerning the sale. In a conversation on March 17, 1964, Huber claimed that he asked Mr. Banks for a formal waiver of whatever rights the latter had under the December 30, 1963 Memorandum of Agreement, and that Mr. Banks agreed to sign a document formally waiving his right of refusal. As part of the conversation, Huber claimed that he advised Mr. Banks that the latter had no rights under the agreement, and even if he did Mr. Banks could not raise the money to exercise them.

Proof of the negotiations and contracts between Huber and Mr. Weinberg, as agent, was offered to show the subsequent acts of Huber as an aid to construction of the true meaning of the December 30, 1963 Memorandum of Agreement. As originally drafted, the sales agreement between Huber and Mr. Weinberg, as agent, in reciting Huber's warranty that he was the owner, free and clear of all encumbrances, of 620 shares of stock of Thirty-nine Hundred, contained an exception as to a right of first refusal in Banks. Also, the document as originally drafted recited that Banks had orally waived their right of first refusal and provided for the attachment of a formal waiver, signed by Banks, as an exhibit to the sales agreement; but this latter recitation and provision were both stricken out by interlineation prior to the formal execution of the sales agreement. Huber maintained that his attorneys, in his presence, represented to Mr. Weinberg and his attorneys that Banks had no right of first refusal in regard to a transaction of the type contemplated between Huber and Mr. Weinberg, as agent, but that he, Huber, didn't "feel one way or the other about it too much—that he didn't have any option refusal." A formal waiver of the right of refusal was submitted to Banks and, when they refused to sign it, Huber and Mr. Weinberg entered into an amended agreement to strike out all reference in the sales agreement that the 620 shares of common stock and indebtedness and note of and in Thirty-nine Hundred was subject to a right of first refusal in Banks. The amended agreement was signed March 17, 1964, six days before the Banks entered into an agreement with Mullan to exercise their claimed right of first refusal with funds furnished by the latter.

The testimony of Mr. Banks and Huber is hopelessly in conflict. The testimony of Mrs. Banks is inconclusive. The evidence of Huber's intent, as reflected in his transactions with Mr. Weinberg, is inconclusive and sheds no light on what was the intent of the parties. Both Huber and Mr. Weinberg were represented by capable lawyers, experienced in corporate practice, and it is not unlikely that in an excess of caution they would seek a formal waiver from Banks if the same could be obtained, notwithstanding that their reading of the December 30, 1963 Memorandum of Agreement would lead them to the view that a waiver was unnecessary. The Court concludes that whatever inferences adverse to Huber's

contentions in this Court may be drawn from his testimony concerning his negotiations with Mr. Weinberg and the language of the sales agreement prior to its amendment are neutralized by the fact that the Huber-Weinberg sales agreement was amended in the manner described prior to the time that the Mullans undertook to originate, encourage and finance the purported exercise by Banks of their claimed right of first refusal.

On two things the testimony of plaintiff and Mr. Banks agrees, and the testimony of Mrs. Banks is not in opposition, and that is that all parties were completely in agreement that Huber, and his family's interests, were to be divorced from the interests of Banks, and that Banks were in bad financial condition and Huber would have no part of any extension of credit to them, or either of them. As to the latter, Huber testified, without contradiction from Mrs. Banks, that she had given him a sizeable check which was returned for lack of sufficient funds, and that Mr. Banks was hard-pressed by lending institutions from which he had borrowed money and extensions of credit to him by Huber were in default.

The contradictions between the testimony of Huber and Mr. Banks cannot all be resolved to the satisfaction of the Court. The Court is of the view that both of the principal parties involved have made a career of promoting various enterprises and, like many promoters, are not adverse to continued negotiations, even after they have entered into a formal agreement, in the hope of bettering their version of what should be considered a fixed transaction. The Court discounts sharply the significance of the impeachment of Huber by the inconsistencies between his testimony in court and on deposition. The Court discounts more sharply the testimony of Mr. Banks that "for cash" and "for cash only" meant only that the transaction had a fixed dollar valuation, rather than being an exchange of real estate or other assets other than money. With regard to this testimony, this conclusion is reached not only on general considerations of credibility, but also because of the fact that when Huber and Banks agreed to exchange assets, as evidenced by the December 21, 1962 agreement, they assigned dollar valuations to the assets being exchanged, with the result that there was a cash balance due and owing from Banks to Huber. Accomplished business men, who customarily employ tax attorneys, and who are acutely conscious of the tax laws of the United States, do not have the naivete to assert convincingly that in an exchange of real estate or other assets some dollar valuation is not assigned for purposes of depreciation under the income tax laws and for the establishment of a cost basis for future capital gains or capital losses.

Consideration of the weight of the interpretive evidence, the circumstances of the parties, the meeting in which the December 30, 1963 Memorandum of Agreement was executed by Banks, and the applicable rules of law, leads the Court to the conclusion that the December 30, 1963 Memorandum of Agreement means just what it apparently says, namely, that the right of first refusal existed and came into play *only* if Huber obtained an offer to sell his interest in Thirty-nine Hundred for money and for money alone.

■ "For cash" and "for cash only" mean that delivery and payment are to be concurrent acts which are to be performed at the same instant in time. Koman v. Holtgreve, 207 Md. 85, 87, 113 A.2d 419 (1955). To overcome this normal and natural meaning requires a strong showing of contrary intent. Such a showing is absent here. The more credible interpretive evidence is that the parties desired to eliminate any long-term business relations between them and that Banks had no credit standing. Huber has been relatively consistent throughout the crucial period in limiting Banks' right of first refusal to those situations where a cash offer was made to Huber.

■ Although a contract, ambiguous in its terms, is generally construed

against the person drafting it, Hughes & Co. v. Pioneer Fireproof Door Corp., 230 Md. 36, 185 A.2d 383 (1962), that rule has little application here. Mr. Banks had counsel to represent him in the various business ventures in which he and Mrs. Banks were interested. Mr. Banks had an unexecuted copy of the December 30, 1963 Memorandum of Agreement since approximately December 17, 1963, and a copy of the unexecuted revision of the December 21, 1962 agreement on which the former was based since approximately December 20, 1963 and possibly before. He was invited to consult his counsel and he had every opportunity to consult counsel (if in fact he did not). Mrs. Banks, even if she did not see the December 30, 1963 Memorandum of Agreement until the date of execution, and even if she never saw the unexecuted revision of the December 21, 1962 agreement, read the former prior to its execution. Her claim that at the time of the execution the document had the meaning she then purportedly placed on it, is considerably weakened by her present understanding. On close analysis her testimony admits that if there was confusion on her part at the time of execution, the fault was her inability to grasp the meaning of the written word.

The Court finds from the evidence no mutual mistake on the part of all parties. Nor does the Court find such unilateral mistake on the part of Mr. and Mrs. Banks to warrant nonenforcement of the December 30, 1963 Memorandum of Agreement, City of Baltimore v. DeLuca-Davis Const. Co., 210 Md. 518, 124 A.2d 557 (1956). If in fact there was mistake on the part of Mr. Banks, he has only his own negligence to blame in not consulting his lawyer or permitting the lawyer to represent him. The inference is inescapable that Mrs. Banks signed, not because of what she thought the December 30, 1963 Memorandum of Agreement meant, but because her husband was about to, or already had, signed it. Huber acted in good faith. When he received the Weinberg offer he made no effort to hide it from Banks; hence, he did not seek to take advantage of mistake on the part of Banks. They, having put Huber in a position where nonperformance to Chesapeake & Dallas would create liability on his part, are not in a position to restore him in *statu quo*.

The sequela of a contrary construction support the conclusion before stated. The evidence is strong that Huber would not give Banks further credit. If the December 30, 1963 Memorandum of Agreement is interpreted as Banks claim, the phrase "the same terms and conditions" contained in paragraph 3(b) must either be held to say something which the parties agree it does not say, or there is a total failure to provide any mechanics for substitute terms and conditions. The latter may be restated as a failure to provide any standards for Huber's accepting notes of someone other than Banks, or notes of Banks guaranteed by someone having an acceptable credit standing.

For these reasons, the Court concludes that the third possible interpretation of the December 30, 1963 Memorandum of Agreement is the true and correct interpretation as contemplated by the parties, that Huber had a right to sell his interest in Thirty-nine Hundred to Weinberg, under the terms and conditions that he did conclude to sell them, free and clear of any rights in Banks; and that, therefore, Banks had no right of first refusal to exercise, and no fruits of the exercise of the right of first refusal to assign to Mullan.

As to the relief to be granted, the Court will declare the rights of the parties under the December 30, 1963 Memorandum of Agreement, as aforesaid. Huber's two other prayers for relief require some further discussion.

Huber's ownership of 620 shares of Thirty-nine Hundred constitutes the ownership of 50% of the issued and outstanding common stock of Thirty-nine Hundred. Thirty-nine Hundred and Mullan have resisted inspection of the books and records of Thirty-nine Hundred on the theory that they are equitable owners of the shares standing in Huber's name.

The Court has decided that Mullan took nothing. Huber is the legal owner of the stock and it is not disputed that the stock is issued, outstanding and registered in Huber's name. As the owner of 50% of the issued and outstanding stock of Thirty-nine Hundred, Huber, who has been such for at least six months, has, under Annotated Code of Maryland, Article 23, § 51(b), the absolute right to " * * * inspect and copy, in person or by agent or attorney, during usual business hours, the corporation's books of account and the stock ledger." Huber is entitled to have his first prayer for supplementary relief granted, since Thirty-nine Hundred has failed to respect this right.

■ Huber's second prayer for supplementary relief relates to the reissuance of two notes evidencing the indebtedness of Thirty-nine Hundred to him. The notes presently possessed by Huber, identical except as to date and amount, are in the form set forth in the margin.[8] By their terms, assignment of the notes is restricted as set forth in paragraph 2, but this restriction purports to be grounded solely on paragraph 12 (denominated Item 12 in the notes) of the December 21, 1962 contract. The form of the notes was drafted by Mr. Ridgely, at a time when he represented Mr. Banks, as well as Huber. It would seem to follow that, since the parties by their actions extinguished their rights in regard to Thirty-nine Hundred under the December 21, 1962 contract by execution of the December 31, 1963 Memorandum of Agreement, this restriction should be extinguished also, unless the language is treated as a general restriction against assignment.

As to the latter, the documentary evidence in the case shows that when Mr. Ridgely, on January 23, 1964, suggested a modification of the restriction to provide that the note should be consolidated in a new note which would be freely assignable, subject only to a right of first refusal which, in turn, * * * shall be operative only in the event of a proposed cash sale of Huber's interest in the Corporation * * * " an officer of Thirty-nine Hundred replied that the proposed new note was not acceptable because " * * * our arrangement with Mr. Huber was that the note was not assignable, but an exception was written into it to allow for such an assignment to Mr. Banks and his wife in accordance with the terms of a certain agreement among Huber and Banks and Mrs. Banks." Notwithstanding this claim on the part of Thirty-nine Hundred, it offered no other proof at the trial to sustain its assertion that an agreement existed between Huber and Thirty-nine Hundred that the notes evidencing Huber's advance to Thirty-nine Hundred would not be assignable except to Banks. The only proof, other

8. "July 3, 1963
"ON DEMAND We promise to pay to GEORGE F. HUBER, JR. Nine Hundred Ninety-six Thousand Dollars ($996,-000.00), with interest at 6% per annum, payable at Baltimore, Maryland, and subject to the following contingencies:
1. Demand for payment may not be made unless and until the Directors of the Corporation agree that the Corporation has suffcent funds on hand, over and above those required for normal operating needs, to pay this note in whole or in part.
2. This Note may be assigned only to GEORGE E. BANKS, III and BARBARA A. BANKS, his wife, in accordance with Item 12 of an Agreement between said 'Banks' and George F. Huber, Jr.,

dated December 21, 1963 [sic], or any amendments thereto, which gives 'Banks' the right to purchase one-half or all of 'Huber's' interest in the Corporation at any time up to December 31, 1967.
3. 'Huber' and/or 'Banks' agree to accept any payment offered on this note, whether in whole or in part, and upon payment will surrender this note for cancellation either in whole or in part, as the case may be.
THIRTY-NINE HUNDRED NORTH CHARLES STREET, INC.
/s/ GEORGE F. HUBER, JR.
/s/ T. F. MULLAN, JR.
sec & treas."

than the letter of the officer of Thirty-nine Hundred, is a letter, written by counsel for it and Mullan on the eve of this litigation, asserting the rights of Mullan and Thirty-nine Hundred. The letter states that by virtue of Banks' exercise of their right of first refusal and assignment to Mullan, Mullan now owns 100% of the stock of Thirty-nine Hundred and " * * * they now own the equitable interest in the note of the corporation in favor of Mr. George F. Huber, Jr., in the amount of $1,150,000.00."

 A note evidencing a promise to repay a sum certain, as distinguished from an instrument creating an obligation which might vary depending upon who is the obligor, is not rendered nonassignable except by clear and unequivocal language prohibiting assignment, 1 Restatement, Contracts (1932 Ed.), § 151. In this case the question of assignment arises solely with regard to a note and, significantly, a note where the time for repayment is completely under the control of the borrower. Clear and emphatic language restricting assignment generally, aside from a restriction to make effective the December 21, 1962 contract, is not present and no reason suggests itself to the Court why the parties should have desired such a result.

 If paragraph 2 of the notes is read to admit of some interpretation, the record before the Court shows: Thirty-nine Hundred asserted the notes were nonassignable after the part of the December 21, 1962 contract pertinent here was extinguished on a basis which has not been disclosed. Huber asserts the notes are assignab'e both by his action in assigning them to Weinberg and by the position he has taken in this Court. Banks, Mullan and Thirty-nine Hundred assert the notes are assignable by their actions in purportedly assigning the notes to Mullan, the statement of their counsel and the contentions they make in this litigation that Mullan are the owners of the notes. Thus, the Court concludes that after execution of the December 30, 1963 Memorandum of Agree-

ment the notes are generally assignable, because the rule of interpretation that assignment may be restricted only by express language to that effect, and the interpretive evidence supplied by all of the parties who have any interest in the question of assignability of the notes, points to that result. The Court will, therefore, grant Huber's second prayer for relief.

Counsel will submit a decree in accordance with the views expressed herein within five (5) days.