## CHERTKOF *v.* HARRY C. WEISKITTEL CO., INC.

[No. 404, September Term, 1967.]

*Decided December 4, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Benjamin Lipsitz,* with whom was *Eleanor J. Lipsitz* on the brief, for appellant.

*Joseph Sherbow* and *Robert W. Kernan,* with whom were *Edward F. Shea, Jr.* and *Sherbow, Shea & Doyle* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The appellant Chertkof, an engineer, sued the Weiskittel Company for $135,000 claimed to be due him under a written agreement employing him as an engineering and production consultant, and Weiskittel counter-claimed alleging in case one that Chertkof's incompetent failures and wasteful deficiencies in performance constituted a breach of his express and implied warranties that he was qualified and able to perform the engineering and design services he had contracted to perform, and in case two that he had been negligent, careless and reckless in attempting to perform his agreed obligations, all with resultant large damages to Weiskittel, claimed to be $500,000.

The case came to trial in the Superior Court of Baltimore City before Judge Prendergast and a jury. The first—and as it turned out the only—witness was Chertkof, who testified the first day of the trial and most of the next day. A question as to the admissibility of evidence on negotiations between the parties came up and at that point counsel for both sides and the court apparently foresaw a revival of the possibility of settlement. When court convened on the third day, Judge Prendergast was urged by all the lawyers to see if the case could be settled. The jury was asked to retire and the judge met with counsel and

then, at counsel's suggestion and with their full approval and consent, met in chambers with Chertkof and two Weiskittel principals for an initial interval of two hours, during which Chertkof says:

> "I think I impressed on the Court that the first prime consideration would have to be exoneration from the counter-claim, and the Court tried to assure me that this would be in the form of a release and a judgment in favor of the defendant in the counter-claim. We didn't reach the monetary aspect of the case, or settlement until [Judge Prendergast] gave us permission to talk to our counsels and discuss that aspect."

Judge Prendergast suggested that the parties go to lunch with their respective lawyers to review and consider what had transpired during their meeting with him and this suggestion was followed.

After lunch counsel conferred with the judge and then was replaced in chambers by the parties for a further discussion. Then the parties came out and counsel went in and, after a bit, counsel came out into the court room and Mr. Hamilton Whiteford, Chertkof's lawyer, handed Chertkof a piece of paper on which the court had written a sum which might serve as a basis for settlement—$85,000—and Chertkof says:

> "I stated I would take this in respect of the Court and that I wanted exoneration, and you assured me, sir [Judge Prendergast], that I would have this in the form of a judgment, and Court costs and it would be stipulated in the release."

This statement of acceptance of the amount suggested by the court and of the proposed exoneration was made in chambers in the presence of counsel and the court and other details of the proposed settlement similarly were made known. It was then late in the day so it was further agreed that there would be a meeting in the morning, at which the terms of the agreement of settlement would be dictated to the court reporter.

In the morning Chertkof's lawyer and Weiskittel's lawyers

appeared before Judge Prendergast in his chambers. Chertkof's lawyer advised the court that Chertkof would not attend but would like a copy of the transcript of the proceedings in open court and a copy of the settlement stipulation.

Weiskittel's lawyer dictated to the reporter the terms of the agreement reached the day before. Chertkof's lawyer did not object to the terms of the agreement as dictated nor did he indicate or suggest that what was dictated was not a complete and accurate expression of what had been agreed on.

When the dictation ended, Judge Prendergast advised the jury that "an amicable disposition of these cases has been entered into by the parties and their counsel," ordered the withdrawal of a juror and declared a mistrial.

The settlement agreement provided that (a) the original case would be entered agreed and settled and a judgment for costs entered in favor of Chertkof on Weiskittel's counter-claim against him; (b) general releases would be executed by all parties and exchanged; (c) no appeals would be taken; (d) Chertkof would be given a writing obligatory for $85,000 payable, without interest, in quarterly instalments over a period of five years, with the right of prepayment at any time without penalty; the first payment would be due three months after the filing of the orders in court; and (f) the parties would not release any part of the terms agreed to to the press, Dun and Bradstreet or any other credit agency or file them in the case.

In due time the papers carrying out the settlement were forwarded to Chertkof's lawyer. Chertkof then claimed three changes should be made: (1) he wanted, as the court later characterized it, an "apology" in the release in the following explicit form: "It is further acknowledged that the allegations contained in the counter-suit were without foundation"; (2) he wanted Weiskittel to give up the right to prepay the $85,000; and (3) he wanted the first payment to be accelerated from three months to one month.

Weiskittel would not agree to the proposed changes, taking the position that a general release and a judgment for costs on the counter-claim were all that had been agreed to, and that the language requested would unjustifiably imply unethical conduct on the part of its lawyers who filed the counter-claim and

expose its corporate successor to a possible suit for abuse of process. It saw no need or justification for giving up a right to prepay or a delay in time of payment which had been precisely agreed on.

After tender on its part and several unsuccessful demands on Chertkof for performance of his agreement, Weiskittel on July 7, 1967, filed a motion for enforcement of the settlement agreement. A hearing on the motion was held July 20, at which Chertkof and his lawyer appeared. Mr. Whiteford told the court that no answer to the motion would be filed but he wanted Chertkof to explain for himself why he felt he should not sign the settlement papers. Counsel for Weiskittel objected on the ground that the parties and their lawyers had come to a complete agreement which had been approved by the court and "any testimony now of any character relating to subsequent matters would be improper and have no bearing on the case." Mr. Whiteford replied that he wore two hats—one as Chertkof's advocate who "argues very strenuously that Mr. Chertkof has a perfect right to explain why he does not want to sign a release," and the other as an attorney in litigation who had participated in the settlement of that litigation and who, as such, could not in good conscience object to Weiskittel's objection.

Mr. Whiteford then told the court that Chertkof was dissatisfied because under the terms of the agreement "he was entitled to exculpation from the charges made against him [in the] countersuit * * * and that the verdict in the counter-claim does not duly fulfill that purpose."

The court then heard from Chertkof who amplified at some length essentially what we have quoted earlier. Counsel for Weiskittel were then heard, during which there was recorded a question by the court to Mr. Whiteford as to whether there was anything in the release to Chertkof "contrary to the understanding arrived at in this stipulation * * *" and his reply was that "it is not contrary to my understanding. It is contrary to my client's understanding in that it lacks something."

Judge Prendergast's impression at the conclusion of the hearing was that the release to Chertkof,

"and accurately sets forth what * * * they [Weiskittel] undertook to do insofar as their obligation to ex-

ecute a release of any claims which they may have against Mr. Chertkof * * *. The only matter not mentioned * * * is in effect an apology. Now, where a settlement is made between parties apologies are normally not part of the consideration for the settlement * * *. I cannot insist * * * that either release be modified so as to include what for want of a better term, I call an apology. I think if I were to do that, I would be quite arbitrary and unreasonable. I therefore feel that Mr. Chertkof ought to execute the Release."

Judge Prendergast later made formal findings of fact and conclusions of law, including a finding that on June 7 "the parties agreed in the presence of the Court that the case of *Chertkof v. Weiskittel* was settled and that a judgment in favor of Chertkof for court costs would be entered in the case of *Weiskittel v. Chertkof,*" a finding that on June 8 "the agreement of settlement was dictated to the Court Reporter and thereafter transcribed," and a finding that "the settlement agreement entered into by the parties in the presence of the Court is a binding contractual obligation on all parties to this case," and a finding that the release to Chertkof was in accordance with the settlement agreement.

The court appointed a trustee to execute for Chertkof a release and order of satisfaction to Weiskittel, ordered the filing of Weiskittel's release to Chertkof and the entry of a judgment for costs in favor of Chertkof and the payment of that judgment by Weiskittel, as well as the payment by Weiskittel of the agreed amounts to the trustee, to be paid into the registry of the court.

Chertkof makes two contentions. The first, in several subdivisions, is that no valid or enforceable settlement agreement was ever reached because the trial court's participation in the negotiations vitiated any possible agreement, there was no meeting of the minds as to exoneration, the agreement dictated on June 8 to the court reporter for several reasons was not, and did not purport to be, in itself an agreement but only a formal recording of what counsel and the court thought the agree-

ment made the day before had been, and in any event the stipulation could not have been an independent agreement because Chertkof's lawyer was not authorized to settle for less than the apology from Weiskittel and could not legally bind his client to do so.

Weiskittel argues that (1) the parties agreed on June 7 to execute a written contract on June 8, that the dictation was a complete and accurate integration of the earlier oral agreement and parol evidence to vary it should not be heard or considered since Weiskittel is entitled to a conclusive presumption that Chertkof's lawyer was authorized to act for him in settling the litigation; (2) the oral agreement of June 7 is binding in any event, without regard to the integration of June 8 and the trial judge properly so found; and (3) the trial judge was guilty of no impropriety or error in (a) participating in and aiding the settlement or (b) in deciding the motion to enforce the settlement; and (4) Chertkof did not challenge the judge's actions below and, therefore, did not preserve these questions for appellate review.

We find it unnecessary to pass on the contentions of the parties seriatim for in our view Judge Prendergast was guilty of no impropriety or error in participating in and aiding the settlement negotiations or in deciding the motion to enforce the settlement agreement and his findings of fact that Chertkof made a binding contract to settle on June 7 and that the dictated stipulation of June 8 accurately and fully expressed the terms of the contract of June 7, as well as the finding that the release to Chertkof included all that had been agreed to are not only not shown to have been erroneous but are soundly supported by the record.

Courts look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony. Often a trial judge can be the catalyst in producing a settlement and if he acts as a true catalyst that merely initiates or permits a reaction without itself changing or becoming part of the reaction, he remains an unchanged, fair and impartial judge and cannot be legitimately criticized. A judge seeking to aid in settlement must be careful not to indicate bias, prejudice or strong

feelings, must be impartial and must not force his will upon or unduly press his views upon the parties; generally, he should act through counsel and not deal with the parties alone. We think that Judge Prendergast acted as a judicial catalyst should act and entirely properly. The suggestion that he attempt to promote settlement and that he confer alone with the parties came from counsel for both sides and had their full approval. Counsel were fully advised of what was transpiring from time to time during the negotiations by the judge, and the parties were sent by the judge to confer with their lawyers as the negotiations progressed. There is nothing to even hint that there was bias, prejudice, strong feeling or lack of impartiality on the part of Judge Prendergast or that he sought to force his will upon or pressure either side. Nothing he did in this regard vitiated or impaired the settlement reached. See Annotation—Judges Comments—Urging Settlement, 6 A.L.R.3d 1457 and particularly § 5, "Comments out of court; in chambers, Part [b] "Held or recognized not to be improper, or to be nonprejudicial," and cases cited thereunder.

The record makes it entirely clear also that neither bias, prejudice, strong feelings or lack of impartiality played any part in Judge Prendergast's consideration or determination of the motion to enforce the settlement agreement. We see no reason why, as a matter of law, he was disqualified to act simply because he had a knowledge of what had previously happened in the case, a knowledge obtained in the course of his official judicial duties. We have recognized that merely because a finder of fact has knowledge of previous happenings in a case it is not to be presumed he has prejudged the case. *Board of Medical Examiners v. Steward,* 203 Md. 574, 583. There is nothing in the record to suggest that Judge Prendergast did not decide the motion to enforce the settlement on an entirely objective basis.

Another reason why Chertkof cannot prevail in his claim that he is not bound on his contract to settle is that he knowingly and voluntarily with full knowledge of all pertinent facts submitted to Judge Prendergast the determination of his claim that the release was not in accord with the agreement reached. If Chertkof had a wish or a right to have the issue he raised tried by another finder of fact, he waived that wish or that right. Even

a fundamental constitutional right can be knowingly and voluntarily waived. The effect of such a waiver is reflected in Maryland Rule 885, providing that a matter not raised or decided below will not ordinarily be considered on appeal. See in this connection and context *Wright v. Mathias* (D.C. Mun.App.), 128 A. 2d 658.

Judge Prendergast's finding that the exoneration provided by the general release to Chertkof and the judgment in his favor for costs was fully in accord with what was agreed to orally on June 7 and reduced to writing on June 8 finds support in Chertkof's own statements to Judge Prendergast. He told the court before lunch on June 7 that "the prime consideration would have to be exoneration from the counter-claim" and stated that "the court tried to assure me *that this would be in the form of a release and a judgment in favor of the defendant,"* (emphasis added). Later in the day, after the $85,000 figure had been agreed to, Chertkof says he then told Judge Prendergast that he would accept the $85,000 "in respect of the court" and "you [Judge Prendergast] assured me, sir, that I would have this *in the form of a judgment, and Court costs and it would be stipulated in the release,"* (emphasis added). To this must be added the statements of counsel as officers of the court to Judge Prendergast, including those of Chertkof's lawyer who, with commendable candor, as his duty required, conceded that what Chertkof says Judge Prendergast told him the form the exoneration would take is what was agreed upon. Further support for the finding that Chertkof agreed to what the dictated stipulation provides is the fact that an apology for allegations in a pleading would be so unusual that had it been agreed to, it surely would have been clearly and unmistakably spelled out.

There are other buttressing inferences that the dictation of June 8 fully and accurately expressed the agreement of June 7. It may fairly and reasonably be inferred that the oral agreement and the written expression thereof fully coincided because it is known that Chertkof went to lunch on June 7 with his lawyer after a two-hour discussion of his prime wish for exoneration, later that day heard the settlement terms revealed to the lawyers after full agreement had been reached, and chose

not to go to the meeting the next morning but to permit his lawyer to express the terms in a writing, which he certainly would not have done if he had not thought his lawyer knew precisely what had been agreed to and which his lawyer would not have done had he not been confident he knew precisely what was to be reduced to writing.

Chertkof's claim that there was no meeting of the minds because he thought exoneration meant one thing and everyone else thought it meant another is refuted not only by his own accounts of Judge Prendergast defining it to him but by the law of contracts. In *Ray v. Eurice,* 201 Md. 115, 127, we quoted with approval *Williston, Contracts* (Rev. Ed.), § 21, and then Judge Learned Hand as follows:

> " 'The only intent of the parties to a contract which is essential, is an intent to say the words and do the acts which constitute their manifestation of assent.' Judge Learned Hand expressed it in this wise: 'A contract has, strictly speaking, nothing to do with the personal or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort.' *Hotchkiss v. National City Bank,* 200 Fed. 287, 293."

We also quoted with approval § 94, page 294 of *Williston*:

> " 'It follows that the test of a true interpretation of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.' "

See, too, Restatement *Contracts* §§ 19, 20, Comment a, 21 and 71, Comment a.

Chertkof's reliance on unilateral mistake is further misplaced.

See Restatement *Contracts* §§ 71 and 501. Comment b of § 501 says in pertinent part:

> "Misunderstanding exists where the words or other acts of the parties indicate assent, but one or both of the parties in fact intend something different from what the words or acts express. If the misunderstanding is due to the fault of one party and the other party understands the transaction according to the natural meaning of the words or other acts, both parties are bound by that meaning."

If Chertkof thought exoneration included an apology or if he was doubtful on the point, he should have had his lawyer tell him what a release and a judgment for costs embraced. If he did not, he has only himself to blame. *Huber v. Mullan* (D. Md.), 246 F. Supp. 8, 17, *aff'd* 350 F. 2d 872 (4th Cir.). Since the words of the agreement as to exoneration had their ordinary and normal meaning to everyone except Chertkof — assuming his position on this point was not an afterthought as it obviously was as to the proposed changes concerning prepayment and the date of the first payment—the test of objective meaning is fully applicable and controlling. *Ray v. Eurice, supra; Glass v. Doctors Hospital, Inc.*, 213 Md. 44, 57-58.

The order appealed from will be affirmed.

*Order affirmed, with costs.*